UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SPIRTAS COMPANY, D/B/A | ) | |
| SPIRTAS WRECKING COMPANY, | ) | |
| | ) | |
| Plaintiff / Counterclaim Defendant, | ) | |
| | ) | |
| vs. | ) | Case No.  4:11CV00829 AGF |
| | ) | |
| NAUTILUS INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant / Counterclaim Plaintiff. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Spirtas Company ("Spirtas") brings this action for a declaratory judgment and to recover damages under a commercial general liability ("CGL") insurance policy issued by Defendant Nautilus Insurance Company.  Defendant has filed a counterclaim for a declaration that under the terms and/or exclusions in the Policy, Defendant owes no duty to indemnify or cover Plaintiff for any claimed loss.  Now before the Court are the Parties' cross motions for summary judgment.  For the reasons set forth below, Defendant's motion (Doc. No. 26) shall be granted, and Plaintiff's motion (Doc. No. 40) shall be denied.

## BACKGROUND

### The Subcontract Agreement

On February 5, 2010, Plaintiff, as subcontractor, entered into a Subcontract Agreement with Edward Kraemer & Sons, Inc. ("Kraemer"), as contractor, whereby

Plaintiff agreed to provide demolition work to "Remove Exist[ing] Structure" of the

Seneca Bridge over the Illinois River (also called the Seneca River), in exchange for

payment by Kraemer of  $285,000.00.  (Doc. No. 28-1.)  Demolition of the bridge was

part of a highway project for which Kraemer was the general contractor for the Illinois

Department of Transportation, the owner of the bridge.

The Subcontract Agreement between Plaintiff and Kraemer included the following

provisions:

8. <u>Indemnity for Delay</u>. [Plaintiff] shall indemnify and hold [Kraemer]
harmless from all damage, loss, cost, liability or expense ("damage") which
[Kraemer] may sustain by reason of any delays caused or contributed to by
[Plaintiff].

16. <u>Back Charges and Setoffs</u>.  In the event [Plaintiff] shall fail to perform
. . .  any of the subcontract work . . . , or in the event [Kraemer] suffers any
damage whatsoever or is caused any expense, loss or liability by [Plaintiff],
all such payments made and all related costs incurred by [Kraemer] . . . may
be deducted by [Kraemer] from amounts otherwise due hereunder to
[Plaintiff].

25. <u>Public Liability and Indemnity</u>.  [Plaintiff] shall be liable and
responsible for . . . damage or injuries to any property whether belonging to
[Plaintiff], [Kraemer] or to others, resulting or arising from acts, omissions
and negligence of [Plaintiff] or its agents, employees or sub-subcontractors
or suppliers.  [Plaintiff] shall indemnify and hold [Kraemer] and its agents
and employees harmless from any and all loss, liability, penalties, damages,
costs, attorneys' fees, expenses, causes of action, claims or judgments
resulting . . . from damage, injury to or destruction of property (including,
but not limited to the loss of use of such property) arising out of, sustained,
or in any way connected with the performance of the subcontract work
under this Agreement, regardless of whether or not such damage, injury,
harm or death, affected by or results from the contributory or comparative
negligence of [Kraemer], its agents, servants and employees, but only to the
extent caused by [Plaintiff].

2

The Subcontract Agreement required Plaintiff to maintain certain insurance, including CGL insurance with an occurrence limit and project limit of $1 million each, for an aggregate limit of $2 million.

**<u>The Insurance Policy</u>**

On June 30, 2010, Plaintiff purchased from Defendant a CGL policy for the period of June 30, 2010, through June 30, 2011.  (Doc. No. 2-5.)  The insuring clause provided in pertinent part:  "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  The Policy further stated: "This insurance applies to 'bodily injury' and 'property damage' only if: (1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory' . . . ."

The Policy defined "property damage" as,

**a.** Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

"Occurrence" was defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  The Policy did not define "accident" or "legally obligated to pay as damages."  Coverage was subject to a $1 million limit of liability that applied to each "occurrence."

The Policy contained numerous exclusions, including the following:

This insurance does not apply to:

*   *   *

**j. Damage To Property**

"Property damage" to:

*   *   *

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

*   *   *

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

The Policy defined "impaired property" as

tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

4

(a) It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

(b) you have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

(a) the repair, replacement, adjustment or removal of "your product" or "your work"; or

(b) your fulfilling the terms of the contract or agreement.

The Policy included a "Demolition Contractors – Mistaken Demolition" Endorsement that provided in pertinent part that Exclusion j.5 did "not apply to 'property damage' arising out of the inadvertent or mistaken demolition of property resulting from the insured's demolition and/or wrecking operations."  (Doc. No. 2-5.)

## Demolition of the Bridge

On November 4, 2010, Plaintiff entered into a subcontract with Dykon Explosive Demolition Corp. ("Dykon") to carry out demolition work on the main span of the Seneca Bridge.  The Project Manager for Plaintiff attested by affidavit as follows:

> According to the Demo Plan, the top strut of the Seneca Bridge was to be left intact, so that each of the bridge panels that were separated from one another when the charges detonated would still be connected along the top. The idea was for the Seneca Bridge to be cut by the charges like a loaf of bread, but still connected by the top strut.  Under the Demo Plan, the Seneca Bridge would then sit in the river bed, with each panel still connected by the top strut to ensure that each piece would be easy to locate. Workers would then hand cut each of the pieces from the top strut one at a time, removing the separated piece by crane before moving on to the next piece.  The process was to be similar to removing a slice at a time from a loaf of bread.  The Demo Plan scheduled sixteen (16) hours for the complete demolition and removal of the bridge span.  The completion time for the demolition and removal was critical because barge traffic on the

5

Seneca River had to be stopped from the start of the demolition through completion of the removal process.  What occurred deviated significantly from what was contemplated in the Demo Plan.  At 7:00 a.m. on November 18, 2010, after all barge traffic had been stopped clear of the demolition site, Dykon detonated the charges.  Only five (5) of the fourteen (14) charges set on the bottom chord of the Seneca Bridge detonated.[1]  This left part of the bridge span connected to the intermediate abutment, with the rest of the bridge span in the water with the pieces twisted and mangled together.

(Doc. No. 38-2.)

The Project Manager attests that as a result, Plaintiff had to hire divers to determine which pieces were still connected to one another and set underwater charges to cut the bridge span into pieces.  Plaintiff then removed the pieces, reset and detonated charges on the bridge piece that was still attached to the abutment, and removed that piece.  The demolition that was projected to take 16 hours actually took approximately 60 hours, with the river not reopened for barge traffic at the site until the evening of November 21, 2010.  *Id.*

**Plaintiff's Additional Costs, the Back Charge, and Defendant's Denial of Plaintiff's Claim**

According to the Project Manager's affidavit, due to the flawed demolition, Plaintiff incurred additional costs totaling $81,951.95 ("Additional Costs") to complete the demolition project.  The record does not contain an itemization of these costs.  By letter dated November 26, 2012, Kraemer informed Plaintiff that Kraemer intended to

---

[1]    The affiant may have inverted these numbers, as it appears from a video of the event available for viewing on YouTube at, e.g., http://www.youtube.com/watch?v=wwa6KLV49ws, that nine charges detonated.

hold Plaintiff responsible for costs resulting from the delay in the demolition due to the failure of some of the explosives to detonate.  The letter stated that these costs included, but were not limited to, "additional labor and equipment provided by [Kraemer] to open the channel, additional costs for tow boats assisting the removal operations, demurrage charges assessed by delayed marine traffic and any civil penalties assessed by the [United States Coast Guard]."  (Doc. No. 2-2.)  On February 17, 2011, Kraemer informed Plaintiff that it was withholding $150,328.97 from Plaintiff under the Back Charge provision in the Subcontract Agreement, to cover these costs.  The record does not include an itemized breakdown of this total.

In March 2011, Plaintiff presented Defendant with a notice of claim for $232,280.92 to cover Plaintiff's Additional Costs of $81,951.95, as well as the Back Charge kept by Kraemer.  By letter dated April 6, 2011, Defendant denied the claim, explaining its position that various terms, conditions, and exclusions barred recovery by Plaintiff under the Policy.  (Doc. No. 2-4.)

Plaintiff filed this action on May 10, 2011, seeking declaratory judgment that Defendant has a duty under the Policy to indemnify Plaintiff for the full amount of its claim, and asserting claims for breach of contract and vexatious refusal to pay. Defendant filed a counterclaim for declaratory judgment that it does not owe a duty to

7

indemnify Plaintiff for Plaintiff's losses arising out of Plaintiff's failure to perform under its contract with Kraemer.[2]

## ARGUMENTS OF THE PARTIES

### Defendant's Arguments

Defendant first argues that Kraemer's refusal to pay a portion of the amounts owed to Plaintiff under their Subcontract Agreement does not establish that Plaintiff was "legally obligated to pay" those amounts "as damages," because Plaintiff had no obligation to pay these sums based on a settlement or judgment in a suit filed against it by a third party.  Defendant next argues that the failure properly to demolish the Seneca Bridge was not an insurable "accident."  Defendant asserts that under Missouri law, "[a] liability insurance policy is not a performance bond," and that the negligent performance of a contractual duty is not an "accident" for purposes of general liability insurance coverage.

Moreover, Defendant argues, the costs Plaintiff incurred as a result of its failure to demolish the Seneca Bridge in accordance with its contract with Kraemer did not result in "property damage," as that term is used in the Policy.  Defendant maintains that coverage under the Policy was

---

[2]    The Court notes that on December 2, 2012, Plaintiff filed another action, *Spirtas v. Liberty Surplus Ins. Co.*, 4:11CV02098 JCH, in which it seeks coverage for the same $232,280.92, as an "additional insured" on a CGL policy issued by the defendant to Dykon.

> intended to apply to tort liability for physical damages to others, and not for contractual liability of the insured for economic loss suffered because the completed work is not what the damaged person bargained for.  A claim limited to remedying faulty workmanship or materials does not involve "physical injury to tangible property" or "property damage."

(Doc. No. 27 at 9.)

In sum, Defendant argues that under Missouri law, economic loss resulting from an insured's substandard work or failure to comply with a contract is not covered by a CGL policy such as the one here.  Defendant also relies upon the "business risk exclusions," (Exclusions j(5) and j(6)) and the "impaired property exclusion" (Exclusion m) as barring coverage for Plaintiff's claimed losses.

**Plaintiff's Arguments**

Plaintiff argues that the Additional Costs and Back Charge are sums that it was "legally obligated to pay as damages," "because of property damage" caused by an "accident," and are thus covered under the clear terms of the Policy.  Specifically, Plaintiff argues that it was "legally obligated to pay" the Additional Costs and Back Charge "as damages" even though neither Kraemer nor any of the parties to whom Plaintiff paid the Additional Costs initiated judicial proceedings against Plaintiff; and that Dykon's negligent demolition was an "accident" because it was not anticipated or expected by Plaintiff.

Furthermore, according to Plaintiff, it was legally obligated to pay the sums in question "because of property damage," as the term "property damage" was defined in the Policy.  Plaintiff reasons that "[t]he Seneca Bridge is tangible property which was

9

physically injured by the improper demolition" and that "[t]here was also physical injury to and a loss of navigable use of the Seneca River for the approximately 44 additional hours."  (Doc. No. 42 at 11.)   Plaintiff states that its "claim does not have to be <u>for</u> property damage, but rather <u>because of</u> property damage."  This, according to Plaintiff, "is a critical distinction."

Turning to the exclusions in the Policy, Plaintiff asserts that Exclusion j(5), as amended by the Mistaken Demolition Endorsement, is inapplicable because "[t]here was property damage to the Seneca Bridge and Seneca River arising out of the inadvertent or mistaken demolition of the Seneca Bridge resulting from [Plaintiff's] demolition and/or wrecking operations," and the Endorsement states that Exclusion j(5) does "not apply to 'property damage' arising out of the inadvertent or mistaken demolition of property resulting from the insured's demolition and/or wrecking operations."  *Id*. at 13.

As quoted above, Exclusion j(6) excludes "property damage" to "that particular part of any property that must be restored, repaired or replaced because '[Plaintiff's] work' was incorrectly performed on it."  Plaintiff argues that this exclusion is inapplicable,

> as per its express terms, [Defendant] must show that the property damage in question was to a particular part of the Seneca Bridge, and further that the particular part of the Seneca Bridge had to be "restored, repaired or replaced." [Plaintiff's] demolition took place on the Seneca Bridge as a whole rather than any particular part.  The phrase particular part must be given meaning, and it inclusion shows that exclusion j(6) does not exclude property damage to property as a whole.  There has also been no showing that any particular piece of property had to be restored, repaired or replaced.

Lastly, Plaintiff argues that the impaired property exclusion, Exclusion m, does not

apply because Plaintiff's claim,

> involves physical injury to property, the Seneca Bridge and Seneca River.
> By its terms, exclusion (m) only applies in instances where property has not
> been physically injured.  Further, the Seneca Bridge and Seneca River are
> not "impaired property" because they both fall under the definition of "your
> work" as the subject of work or operations performed by [Plaintiff] or its
> subcontractors, which is explicitly excluded from the definition of
> "impaired property."  Finally, the Seneca Bridge could not be restored to
> use in that this was a demolition project.

(Doc. No. 42 at 15.)

## DISCUSSION

### Summary Judgment Standard

Summary judgment is proper where there is no genuine issue as to any material

fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(c).  In considering a motion for summary judgment, the facts must be viewed in a light

most favorable to the non-moving party, and the non-moving party must be given the

benefit of all reasonable inferences that can be drawn from the facts.  *Auto Club Ins.

Ass'n v. Sentry Ins.*, 683 F.3d 889, 891 (8th Cir. 2012).

### Applicable Law

As the parties agree, Missouri law governs this diversity action.  As a federal court

sitting in diversity, it is up to this Court to predict how Missouri's highest court would

resolve the issues before it.  *See Cont'l Cas. Co. v. Advance Terrazzo & Tile Co.*, 462

F.3d 1002, 1007 (8th Cir. 2006).  Decisions of intermediate state appellate courts are

persuasive authority that the federal court should follow when they are the best evidence

of what state law is.  *Minn. Supply Co. v. Raymond Corp.*, 472 F.3d 524, 534 (8th Cir.

2006).

      Under Missouri law, "the interpretation of an insurance contract is generally a

question of law, particularly in reference to the question of coverage."  *D.R. Sherry*

*Constr., Ltd. v. Am. Family Mut. Ins. Co.*, 316 S.W.3d 899, 902 (Mo. 2010).  "Under

Missouri rules of construction, the language in an insurance contract is given its plain

meaning if the language is plain and unambiguous."  *Becker Metals Corp. v. Transp. Ins.*

*Co.*, 802 F. Supp. 235, 239 (E.D. Mo. 1992).  Furthermore, "[u]nder Missouri law the

plaintiff [insured] has the burden of showing that the loss and damages are covered by the

policy; the defendant insurer has the burden of demonstrating the applicability of any

exclusions on which it relies."  *Am. States Ins. Co. v. Mathis*, 974 S.W.2d 647, 649 (Mo.

Ct. App. 1998).   If an insurance policy is open to different constructions, Missouri courts

will adopt the construction most favorable to the insured.  *St. Paul Fire & Marine Ins.*

*Co. v. Mo. United Sch. Ins. Council*,  98 F.3d 343, 345 (8th Cir. 1996).  Insurance policy

exclusions are to be strictly construed against the insurer, and it is the insurer's burden to

prove that an exclusion applies.  *Capitol Indem. Corp. v. 1405 Assocs., Inc.*, 340 F.3d

547, 550 (8th Cir. 2003) (applying Missouri law).  The policy must be read as a whole to

determine the intent of the parties.  *Columbia Mut. Ins. Co. v. Schauf*,  967 S.W.2d 74, 77

(Mo. 1998); *The Renco Group, Inc. v. Certain Underwriters at Lloyd's, London*, 362

S.W.3d 472, 478 (Mo. Ct. App. 2012).

**The Coverage Provisions**

As noted above, Defendant asserts that it has no obligation under the Policy because the Additional Costs and Back Charge did not constitute sums that Plaintiff was "legally obligated to pay as damages because of . . . property damage that was caused by an [accident]."  Plaintiff asserts that its claimed losses do meet this language in the insuring clause of the Policy.

Considering first whether Plaintiff was "legally obligated to pay" the Back Charge "as damages," the Court notes divergent judicial views on the matter, as cited by the parties, and the lack of clear precedent in Missouri.  *Compare, e.g.*, *Builders Mut. Ins. Co. v. Dragas Mgmt. Corp.*, 793 F. Supp. 2d 785, 796-97 (E.D. Va. 2011) (holding under Virginia law home builder's costs in voluntarily remediating homes it improperly constructed were not "damages" under CGL policy because there had been no judicial determination of the builder's liability), *with, e.g., Potomac Ins. Co. of Ill. v. Huang*, No. 00-4013-JPO, 2002 WL 418008, at *12-13 (D. Kan. March 1. 2002) (applying Kansas law and holding that an insured distributor of windows was "legally obligated to pay as damages" costs for repair of damage to a home due to defective windows where the distributor acted reasonably in proactively undertaking the repairs before the homeowners filed a lawsuit).

Plaintiff relies on *D.R. Sherry*, 316 S.W.3d 899, as establishing that Missouri follows the latter approach, supporting Plaintiff's position that it was legally obligated to pay as damages the Back Charge and the Additional Costs.  In that case, homeowners

whose home developed cracks in the foundation and damage to the point where it was uninhabitable, threatened to sue the builder unless it repurchased the home.  The builder repurchased the home pursuant to a settlement agreement with the homeowners, and then filed suit against its CGL insurer to recover the repurchase cost.  The Missouri Supreme Court rejected the insurer's argument that there was no coverage because the builder was not "legally obligated" to repurchase the home, reasoning as follows: "A settlement agreement is a contract that creates legally enforceable obligations.  Because of the settlement agreement, [the builder] was legally obligated to pay damages to the homeowners."  *Id*. at 906.

Defendant argues that *D.R. Sherry* does not support Plaintiff's position because, unlike here, in *D.R. Sherry* the insured had been threatened with legal action and proceeded pursuant to a settlement agreement.  The Court does not believe that Missouri courts would find these distinctions determinative.  The settlement agreement in *D.R. Sherry* preceded any legal action against the builder.  Just as there, the builder was still legally obligated to pay for the damage it caused, here too, Plaintiff was legally obligated to pay the Back Charge as damages.  Further, the Subcontract Agreement, as quoted above, expressly authorized Kraemer to deduct or withhold such amounts, and Kraemer exercised that right.

The Court concludes, however, that Plaintiff has not met its burden on summary judgment to establish that it was obligated to pay the Additional Costs "as damages." Sums Plaintiff paid to its own employees, or to hire additional help, to cut the part of the

bridge that fell into the river, to set and detonate charges on the part of the main span that remained attached to the abutment, and to otherwise complete the demolition job are not sums Plaintiff was obligated to pay "as damages."  *See Die-Cutting Diversified, Inc. v. United Nat. Ins. Co.*, 353 F. Supp. 2d 1053, 1055-58 (E.D. Mo. 2004) (holding that expenses incurred by an insured in providing its customer with a replacement product that conformed with its contract with the customer did not constitute "damages" covered by a liability policy).  While there may, arguably, be some portion of the Additional Costs that might qualify "as damages" that Plaintiff was legally obligated to pay, the Court would need further information to make this determination.

The Court finds that the next question – whether Plaintiff was legally obligated to pay the Back Charge because of property damage caused by an "accident" — is a close and intriguing one, but that the Missouri Supreme Court would hold that the faulty demolition was an "accident" as that term is used in the Policy.  Defendant argues that the Court should analyze the case as one involving poor workmanship or a breach of Plaintiff's contract with Kraemer, and hold that the failure to perform a contract according to specifications is not an "accident" as that term is used in CGL policies. Indeed, some Missouri cases seemingly support this position.  *See Mathis*, 974 S.W.2d at 649 (holding that an insured sub-subcontractor's breach of contract by failing properly to construct trenches and duct banks for an electrical conduit and cables was not an "accident"; a "CGL policy does not serve as a performance bond, nor does it serve as a warranty of . . . services"); *Cincinnati Ins. Co. v. Venetian Terrazzo, Inc*., 198 F. Supp.

2d 1074, 1079 (E.D. Mo. 2001) (citing *Mathis* and holding that a contractor's alleged

negligence in pouring a subfloor did not constitute an "accident" within the meaning of

its CGL policy).

However, the weight of authority in Missouri, especially in light of the recent

Missouri Supreme Court case noted above, *D.R. Sherry,* 316 S.W.3d 899, appears to

support Plaintiff's position.  *See Koch Eng'g Co. v. Gibralter Cas. Co.*, 78 F.3d 1291,

1293 (8th Cir. 1996) (holding that under Missouri law, a water distribution system

designed and manufactured by the insured becoming plugged with debris resulting in the

system malfunctioning was an "accident," triggering the insured's CGL policy's

coverage, even if the insured was reckless in designing and constructing the system,

where there was no evidence that the insured intended such results of its action; quoting

*Terrazzo v. Iowa Nat'l Mut. Ins. Co.*, 566 F. Supp. 546, 552 (E.D. Mo. 1983) ("Missouri

case law . . . further provides that an ["accident" in the context of a CGL policy] is that

which happens by chance or fortuitously, without intention or design, and which is

unexpected, unusual or unforeseen.")).

In *D.R. Sherry,* 316 S.W.3d 899, the structural damage to the home was caused by

exposure of the foundation to poor soil conditions.  After the homeowners threatened to

file suit for breach of contract against the construction company that built the home, the

builder agreed to repurchase the home for approximately $265,000, and made claim for

this amount under its CGL policy, which had an insuring clause identical to the one in the

present case.  The insurer declined coverage and the builder filed suit against the insurer

for breach of contract and vexatious refusal to pay.

The Missouri Supreme Court found that the cause of damage to the home, what

could be characterized as the builder's poor performance or breach of contract,

constituted an insurable occurrence/accident based on the homebuilder's testimony that

his company did not foresee that the home would suffer damage from settlement of soil.

"The determinative inquiry into whether there was an 'occurrence' or 'accident' is

whether the insured foresaw or expected the injury or damages."  *Id*. at 905.[3]  *See also*

*Assurance Co. of Am. v. Secura Ins. Co.*, ___ S.W. 3d ___, 2012 WL 2757936, at *7

(Mo. Ct. App. July 10, 2012); 4 Philip L. Bruner & Patrick J. O'Conner, Jr., *Bruner &*

*O'Conner on Construction Law*, Ch. 11.VI.D, § 11:74 (database updated June 2012)

(discussing courts' divergent views about the relationship between poor workmanship and

an accident, and opining that conclusion above is the correct approach).  Here, the parties

have not provided an explanation for why several of the charges failed, but it is not

disputed that Plaintiff did not foresee or expect the demolition to go as it did.

The Court must next determine whether the Back Charge that Plaintiff was

obligated to pay constituted damages "because of . . . property damage" under the Policy.

As quoted above, the Policy defined "property damage" as "[p]hysical injury to tangible

---

[3]   The central question in *D.R. Sherry* was whether the "accident" took place when the
house was built, which was during the CGL coverage period, rather than when the
damage first manifested itself, which was after the coverage period.  The Court held in
favor of the insured.  316 S.W.3d at 905-06.

property . . . or [l]oss of use of  tangible property that is not physically injured."[4]  Plaintiff

maintains that here there was physical injury to tangible property, namely to the Seneca

Bridge and the Seneca River.  Some confusion arises in this case because the case involves

a demolition project.  So, of course Plaintiff (through its subcontractor Dykon) caused

physical injury to tangible property, the Seneca Bridge, but this is what it was hired to do.

However, the bridge was mangled in a way not contracted for.  The Court concludes that

this fits the definition of physical injury to tangible property.  Thus, the insuring

provisions provide for coverage of the Additional Costs and Back Charge that Plaintiff

was obligated to pay because of the mangling, under paragraph (b) of the definitional

clause.

Whether or not the river can be characterized as tangible property that was

physically injured is also not free from doubt.  But analogizing the situation to one where

a  demolition operation caused a pothole to a nearby road, with resulting costs due to

delayed traffic and to needed repairs, suggests that indeed the sums claimed by Plaintiff

here would come within the insuring provisions of the Policy.  In any event, the Court

believes that the loss of use of the river and/or of barges to which river traffic was closed

due to the faulty demolition can reasonably be seen as loss of use of tangible property that

was not physically injured.

---

[4]    Tangible property is used in the Policy to mean property other than intangible
property, such as electronic data.  (Doc. 2-5 at 22.)

In sum, the Court concludes that Plaintiff's claims for the Back Charge are covered by the Policy, unless one or more Policy exclusions bar coverage.

**Policy Exclusions**

The Court concludes that the "business risk exclusions" (Exclusions j(5) and j(6)), construed narrowly as the Court must do, bar Plaintiff's right to coverage with respect to the Back Charge.[5]  Business risk exclusions, such as these, in CGL policies "are based on the apparently simple premise that general liability coverage is not intended as a guarantee of the quality of an insured's product or work."  *Schauf*,  967 S.W.2d at 77-78 (examining the history of these exclusions in CGL policies).  They are "designed to exclude from coverage the business risk of faulty workmanship."  Id. at 79.

Here, the main span of the bridge was "that particular part of real property" on which Plaintiff's subcontractor Dykon performed operations,[6] and the mangling of this part of the bridge, that is, the property damage to it, arose out of those operations.  The Court believes that the part of the river directly beneath this part of the bridge was also a "particular part of real property" on which Dykon performed operations.  *Cf. Ohio Cas.*

---

[5]   The Courts analysis of the Policy exclusions applies equally to any part of Plaintiff's Additional Costs that may have been covered by the Policy's coverage provisions.

[6]   Plaintiff does not argue that either the bridge or the river is not real property, and for the purposes of this case, the Court assumes that both indeed are.  *See Black's Law Dictionary* (9th ed. 2009) (defining "real property" as "land and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land," and stating that "land" is "a three-dimensional space" and is "not confined to solids, but may encompass within its bounds such things as gases and liquids").

19

*Ins. Co. v. Ferrell Devs*., LLC, No. No. 3:10-CV-162-AC, July 27, 2011, 2011 WL 5358620, at *10 (D. Or. 2011) (holding that under Oregon and Washington law, "the term 'particular' property [in a business risk exclusion] is not limited to the specific item the insured is working on at the time of the damage but is more broadly construed to include the property affected by the services performed by the insured"). Thus, by its clear language, Exclusion j(5) bars coverage for Plaintiff's claims. Similarly, the main span of the bridge and the part of the river beneath it had to be "restored" or "repaired" because Dykon's work "was incorrectly performed on [them]," such that Exclusion j(6) also bars coverage.

Plaintiff's arguments that these exclusions do not apply because demolition work took place on the Seneca Bridge as a whole rather than on any particular part, and because there has been no showing that any particular piece of property had to be restored, repaired or replaced, are unpersuasive. Plaintiff maintains the term "that particular part" must be given meaning, and the Court's above construction does just that.[7]

It is true that the main span of the bridge did not have to be repaired or restored to its pre-demolition condition, or replaced. But in the context of a demolition operation, having to correct the mangled state of the main span constituted "restoring" or "repairing." And clearly, that particular part of the river that sustained property damage in the form of

---

[7]   If, for example, the demolition explosives caused damage to a nearby road or slope, that would not be property damage to that particular part of real property on which Dykon performed operations.

loss of use had to be restored to navigability.  The Mistaken Demolition Endorsement, limiting applicability of Exclusion 5(j), does not avail Plaintiff  because this case does not involve the mistaken demolition of other property.

The Court finds that Defendant has also met its burden to show that the "impaired property exclusion," Exclusion m, bars coverage because all sums involved resulted from Plaintiff's failure "to perform a contract or agreement in accordance with its terms."  The exception within Exclusion m does not apply here as there was no loss of  property arising out of "sudden and accidental physical injury to Plaintiff's "product" or "work" . . . after it has been put to its intended use."

Because the Court concludes that the Policy does not provide coverage, Plaintiff's claim for vexatious refusal to pay fails as well.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's motion for summary judgment is **GRANTED**.  (Doc. No. 26.)

**IT IS FURTHER ORDERED** that Plaintiff's motion for summary judgment is **DENIED**.  (Doc. No. 40.)

A separate Judgment shall accompany this Memorandum and Order.

AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 14th day of September, 2012